## Case No. 8,845.

### McKAY et al. v. HILL.

#### [1 Hask. 276.] [1]

#### Circuit Court, D. Maine. Sept., 1870.

CORPORATIONS — STOCKHOLDERS — CAPITAL WITHDRAWN — LIABILITY — LIMITATION — DIVIDENDS NOT EARNED — NOTES GIVEN THEREFOR — STATUTE.

1. The withdrawal of any portion of the capital by a stockholder in a corporation, renders him liable under Rev. St. Me. 1857, c. 46, § 24, for the corporate debts contracted since June 1, 1857, to the amount of capital so withdrawn.

2. To construe a statute, effect should be given to each part of the enactment if possible, that the whole statute may have meaning.

3. The limitation of a year, in the above statute, does not apply to an action for a corporate debt, contracted after June 1, 1857, against a stockholder for having withdrawn capital from the corporation.

4. The surrender by a stockholder of his shares in a corporation and his receiving in exchange therefor the stock of another corporation, that he originally paid for his shares, operates as a withdrawal of capital.

5. So does the receipt of dividends not earned.

6. So does the surrender of shares in exchange for corporate notes that are subsequently paid.

7. Notes of a corporation, given in payment of dividends declared but not earned, are void in the hands of the stockholder receiving them.

Case, by [Nathaniel McKay and others] creditors of an insurance company, against a stockholder [William Hill], charged with having withdrawn the capital of the corporation, and thereby under Rev. St. Me. 1857, c. 46, § 24, become liable for corporate debts. The case was tried upon the general issue before the court without a jury, the parties having given the usual stipulation.

William L. Putnam, for plaintiffs.
Josiah H. Drummond, for defendant.

Before SHEPLEY, Circuit Judge, and FOX, District Judge.

FOX, District Judge. On the 14th day of March, 1866, the plaintiffs procured from the Piscataqua Fire and Marine Insurance Company, a corporation under the laws of this state, having its place of business in the county of York, a policy of insurance for the sum of $2,500, upon the steamer Gen. Hooker for one year, against the usual marine risks. Within the year the steamer was lost,

and at the September term, 1867, of this court, the plaintiffs recovered against that company upon its policy a judgment for $2,703.33 debt and $45.33 costs of suit. Upon this judgment, execution issued October 31st, 1867. December 4th, 1867, the marshal of the district made return thereon, that he had made diligent search for property of the defendants with which to satisfy the execution in whole or in part and was unable to find any, and so for want thereof he returned the execution wholly unsatisfied. On the 2d of January, 1868, he made a further return, that on the 6th of December he had exhibited the execution to William Hill, one of the stockholders of said Piscataqua Fire and Marine Insurance Company, and requested him to show attachable property of the corporation to satisfy the execution, to which Hill replied, he had not any property of said corporation in his hands. On the 6th of December the marshal also served on the defendant a written notice from the plaintiffs, requesting him to show to the officer holding such execution attachable property of the company to satisfy the same, to which defendant replied as before. Thereupon the plaintiffs, on the 31st day of January, 1868, commenced the present suit against Hill, claiming to recover of him, as a stockholder in the insurance company by reason of his withdrawal of a portion of the capital stock of the corporation. The case is submitted to the court under the provisions of the act of congress by written stipulation of the parties, without the intervention of a jury.

The first question which is presented for decision is, whether a stockholder in an insurance company, who withdraws a portion of the capital of the company, is thereby made liable to a law suit in behalf of the creditor of the company, for debts contracted after June 1st, 1857, the defendant contending that such liability no longer exists under any of the provisions of the laws of Maine. The 24th section of chapter 46 of the Revised Statutes of Maine declares that, "the stockholders of all corporations created by the legislature after February 16th, 1836, excepting banking corporations, unless it is otherwise specified in their charter, or by any general law of the state, shall be liable for the debts of the corporation contracted during their ownership of such stock, prior to the first day of June, 1857, in case of deficiency of attachable corporate property, to the amount of their stock and no more; and such liability shall continue, notwithstanding any subsequent transfer of such stock, one year after such transfer is recorded on the corporation books; but no stockholder whose stock has been fully paid in, and no part of the principal has been withdrawn, shall be so liable on debts contracted after said first day of June; but in the latter case, when an officer certifies on an execution against a corporation, that he cannot find corporate property to satisfy it, each stockholder's stock and in-

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

terest in stock may be seized and sold thereon as on execution against him; and he may recover of the corporation the value of the stock or interest so taken, &c."

Section 25 of the same chapter as amended, authorizes a plaintiff, at any time within six months after the return of an execution against a corporation recovered on a debt for which any stockholder is liable under the preceding section, unsatisfied in whole or in part for want of attachable property of the corporation, to demand of any stockholder of such corporation to disclose and show attachable property of the corporation, sufficient to satisfy the execution; and by section 26 such creditor, after demand, may have an action of the case against such stockholder to recover of him individually the amount of his execution and costs, or the deficiency thereof, not exceeding the amount for which such stockholder is liable by section 24; such action to be commenced within six months after judgment recovered against the corporation.

The rights of these parties therefore depend on the true construction of section 24 of chapter 46 of the Revised Statutes. This section in the first place declares that "stockholders of all corporations created, &c., shall be liable for debts of the corporation, contracted during their ownership of such stock prior to the first day of June, 1857, in case of deficiency of attachable corporate property to the amount of their stock and no more; * * * but no stockholder, whose stock has been fully paid in and no part of the principal has been withdrawn, shall be so liable for debts contracted after said first day of June." Upon this language, the argument of the learned counsel of the defendant is, that but one class of liabilities is affirmatively and positively declared, viz: for debts contracted prior to June 1st, 1857; that the subsequent provision as found in this section is not of a positive, certain and obligatory character, declaring or establishing a liability, but is the rather of a negative order in its terms, viz: that for debts of the corporation contracted after the first of June, a stockholder, whose stock has been fully paid in and no part thereof withdrawn, shall not be personally liable for such debts. It is conceded that this company was incorporated after Feb. 16th, 1836, that the demand of the plaintiffs was contracted by the company after the first day of June, 1857, and that by the repealing act of 1857 the prior acts creating a liability against stockholders for corporate debts were repealed, leaving their rights and liabilities dependent on the enactments of the Revised Statues. The language of the 24th section of chapter 46, is certainly peculiar and somewhat doubtful and ambiguous, and we concur with the defendant's counsel, that it does not in clear, direct, absolute and positive words declare an obligation and liability against a stockholder, who has not fully paid in his stock, or who has

withdrawn a portion of the capital. To express such a liability, language much more apt and positive might have been employed by the legislature; and yet, we entertain no doubt that it was the intention and design of the legislature that such conduct on the part of a stockholder, as would reduce or destroy the security which corporate creditors might otherwise have availed themselves of, should subject the stockholder to a personal liability for the debts of the corporation to the extent at least of his stock.

In the construction of statutes, several acts in pari materia and relating to the same subject, are to be taken together and compared, because they are considered as having one object in view, and as acting on one system, and the rule applies, though some of the statutes may have expired or are not referred to in the other acts. 1 Kent. Comm. 463.

By an act of the legislature of Maine, approved Feb. 24, 1821, c. 139, § 2, it was enacted that "in case of any loss or losses whereby the capital stock of insurance companies shall be lessened before all the installments are paid in, each proprietor or stockholder's estate shall be held accountable for the installments that may remain unpaid on his share or shares, at the time of such loss or losses taking place."

The 7th section of the act declares, that "whenever it shall so happen that by losses on policies or otherwise, their corporate property shall be insufficient to pay all their debts, the individual stockholders shall be liable in their private capacity, in case the whole amount of the capital stock is not paid in, to any creditor of said company, to the amount that may be due from said stockholders on their shares."

By chapter 200, Act 1836, this liability was broadly extended, and thereby stockholders in all corporations created after Feb. 16, 1836, excepting banking corporations, unless otherwise specified in their charter, in case of deficiency of attachable corporate property, were rendered liable to have their estate taken on execution against the corporation to the amount of their stock, or to an action on the case, in behalf of the creditor to recover of said stockholder the amount of the execution or the balance due thereon, not exceeding the amount of his stock.

The laws were revised in 1840, and by chapter 76, § 18, this provision of the act of 1836, was re-enacted. In 1855 by chapter 169, the remedy of scire facias was substituted for an action on the case. In 1856, by chapter 271, the 18th section of chapter 76 of Revised Statutes was repealed, but the liability of the stockholders for corporate debts, to the amount of their stock, was re-enacted, and an action of the case restored, and the liability to have their property taken on execution against the corporation was extinguished by a repeal of sections 18, 19, and 20, of chapter 76 of the Revised Statutes.

By a resolve of the legislature of 1856, c.

341, the revision of the laws, which had been made under a resolve of a prior legislature, was committed to Hon. Ether Shepley, "whose duty it shall be to compare the revision made under such resolves, with the existing laws, and make such further revision and new arrangement thereof, including the public laws passed at the present session, as may be necessary to present the same in the most complete form for the consideration of the legislature. Ch. J. Shepley made his report to the legislature of 1857, and in his revision incorporated the provisions of chapter 271 of Laws of 1856, continuing the general liability of the stockholder to the amount of his stock, for all debts contracted by the corporation during his ownership of the stock. Whilst the report of Ch. J. Shepley was pending before the legislature of 1857, and before it had been entirely adopted, that legislature by an act approved April 15, 1867, c. 58, entitled "An act to exempt stockholders in corporations from personal liability," enacted "that the stockholders of all corporations, * * * when the stock of the stockholders claiming this exemption shall have been paid in to the full amount thereof, and no part of the principal shall have been withdrawn, shall not be personally liable for the debts the corporation contracted after June 1, 1857; but when the officer having an execution against the corporation certifies thereon that he cannot find corporate property or estate wherewith to satisfy it, the stock and interest of each stockholder in the stock of the corporation shall be liable to seizure and sale on the execution in the same manner as on execution against him."

This act contains no repealing clause of any former provisions of the statutes. The Revised Statutes of 1857 were passed on the 16th day of April, 1857, approved the 17th, only two days after the approval of chapter 58 above recited. The 24th section of chapter 46 of the Revised Statutes clearly manifests a design to incorporate into the Revised Statutes the provisions of chapter 58, which had received the sanction and authority of the legislature only two days before, and to substitute the provisions of this chapter in place of those found in the revision of Ch. J. Shepley, which were simply a condensation of the act of 1856, c. 271.

From the examination of the prior statutes, it is manifest, that from the organization of this state, it has been its policy to require the capital stock of insurance companies to be fully paid in, and if the same was not done, any delinquent stockholder was subject to the suit of a creditor of the company for the amount unpaid; that in 1856 a much more stringent liability was established by which stockholders were, without any such faults on their part, either of neglecting to pay in full their subscription to the capital stock, or not allowing it to remain as a part of the capital, rendered generally liable to the amount of their stock for debts of the

corporation contracted during their ownership.

This liability, onerous and severe as it manifestly was, continued until the session of the legislature of 1857, when chapter 58, Acts 1857, was enacted. But it was not entirely and absolutely extinguished by that act, although the title of the act is "An act to exempt stockholders in corporations from personal liability." The language of the act is perfectly clear and precise, and its import and effect does not admit of any question. Previous to its passage, stockholders were thus liable. The act of 1857 does not in terms repeal any of the prior acts by which such liability was created, but it declares that stockholders, whose stock has been fully paid in and no part of the principal shall have been withdrawn, shall not be personally liable. The liability certainly remained upon the stockholder, whose stock had not been fully paid in, or when a portion of the capital had been by him withdrawn, and it is quite apparent from the language employed, that on the 15th of April, the legislature did not contemplate an entire release of the stockholders from liability, but the rather did intend that if the capital was in any way deficient through the agency of the stockholder, he should continue responsible for the debts of the corporation.

In this state of the law, can we presume that two days afterwards, by the passage of the Revised Statutes, it was the intention and purpose of the legislature to abolish all liability of stockholders, a liability founded in justice and reason, and which had been so carefully guarded and protected by its enactments but a day or two previously? Could it have been the intention and design to have allowed such fraudulent dishonest proceedings on the part of the stockholders to become thus beneficial to the guilty party, and so unjust and detrimental to the innocent creditors of the company? It became necessary to incorporate into the Revised Statutes the provisions of the various acts passed at that session of the legislature, and in accomplishing this purpose, the legislature adopted the language now found in chapter 46, § 24, and at the same time it repeals chapter 58, and all other provisions of previous laws touching the liability of such stockholders.

The Revised Statutes were intended as a revision of former laws, and it has been expressly decided by the supreme court of Maine, Hughes v. Farrar, 45 Me. 72, that in the revision of the statutes of 1857, the principal design was to revise, collate and arrange the public laws, and in revising, to condense as far as practicable; that a mere change of phraseology should not be deemed a change of the laws unless there was evident intention in the legislature to make such change. The same principle as to the construction of statutes which are intended as a revision of former laws is found recognized in Gaffney v. Colvill, 6 Hill, 567; Cros-

well v. Crane, 7 Barb. 191; Taylor v. Delancy, 2 Caines, Cas. 143; Conger v. Barker, 11 Ohio St. 15.

It being certain that the general liability of stockholders existed from 1856 to 1857, and that it was not entirely abolished by the legislature of 1857, by act of April 15th, c. 58, but was thereby only modified and allowed to remain and exist in full force against this particular class of delinquent stockholders, guided by these decisions and rules of law, we cannot conclude that there was intended by the same legislature to be an entire extinction of such liability from the language it has seen fit to adopt in its revision as contained in the 46th chapter.

We do not find there any language sufficient to satisfy our minds that the legislature intended to make any change. On the contrary, it is manifest that they understood such liability existed, and they intended it should remain unabridged. After declaring expressly the liability of stockholders for corporate debts contracted prior to June 1, 1857, the act further declares "that no stockholder whose stock has fully been paid in, and no part of the principal has been withdrawn, shall be so liable for debts contracted after said first day of June." This language was designed to have some meaning, to convey some idea, to have force and effect as declaratory of the legislative will, and unless it is to be construed as recognizing a liability on the part of stockholders, thus refusing to make good their proportion of the capital stock, or who shall have diminished it after it has been paid in, the language is senseless and of none effect.

It should be remembered that all prior acts, relating to liability of stockholders in these corporations for the corporate debts, were repealed. No liability for these debts existed at common law, and the first clause of the 24th section, c. 46, was restricted to a liability for debts contracted prior to June 1, 1857. What force, propriety or object was there then in formally enacting that stockholders who had not withdrawn any portion of their capital should not be liable for debts contracted after June 1st? There was no such liability. Strike from this section this clause, leave it with only the prior clause, declaring stockholders liable for debts contracted prior to June 1st, without any other enactments on the subject, and it would make no difference whether the capital had or had not been fully paid in, or any portion thereof subsequently withdrawn, because no provision of law existed creating any liability for any debts contracted after June 1st; this provision is to be construed as exonerating such delinquent stockholders from liability for debts of the corporation contracted after June 1st.

When stockholders were already exonerated therefrom, and their liability by the previous clause expressly restricted to the debts contracted prior to June 1st, it is apparently the merest absurdity to declare a class as exempt, when by the most comprehensive language in the same section, the liability of the whole body of stockholders was limited to debts previously contracted, and by no existing provision of law were they subject to liability for debts subsequently contracted.

A statute is not to be thus construed; on the contrary, force and effect should be given to every clause, sentence and word contained in it if possible, so as to carry into effect the design and intention of the legislature. No clause or sentence should be deemed void, superfluous or unimportant; and if from the whole statute the intent is different from a literal import of some of its terms, the intent must prevail. It is our duty therefore to hold, that by this second clause the legislature intended some operative, effectual provision, other than that which preceded it, and not that it was mere surplusage, an ambiguous repetition in part of what it had expressed in the clearest language a few lines previously. In U. S. v. Freeman, 3 How. [44 U. S.] 565, Wayne, J., says, "Whenever any words of a statute are doubtful or obscure, the intention of the legislature is to be resorted to in order to find the meaning of the words. A thing which is within the intention of the maker of the statute, is as much within the statute as if it were within the letter. 'Every part of the act is to be taken into view for the purpose of discovering the mind of the legislature.' " In U. S. v. Babbitt, 1 Black [66 U. S.] 61, Swayne, J., says, "What is implied in a statute is as much a part of it as what is expressed;" and this principle was re-affirmed in Gelpcke v. Dubuque, 1 Wall. [68 U. S.] 221.

In Ryegate v. Wardsboro, 30 Vt. 749, the court says: "The question arises, are we at liberty when the words of the statute are plain and unambiguous, but are directly repugnant to the whole spirit and intent of all our legislation on the same subject, and in the same act, and seem to involve an absurdity, to disregard the letter of the law and attach to it that meaning which the legislature really intended? It is urged that when the language of a statute is plain, clear and intelligible, it is itself the best, and should be the only expositor of the meaning of the legislature. Theoretically, this argument would seem to furnish a safe rule of interpretation. Practically it is not always safe or sensible. A rigid adherence to it woud not unfrequently involve us in contradictions, absurdities and palpable violations of the real intention of the legislature. * * The letter of the law is found by experience not to be in all cases a correct guide to the true sense of the lawgiver." The 14th section of the bankrupt act in terms dissolves only those attachments made within four months from the commencement of proceedings in bankruptcy, and yet it was decided in Leighton v. Kelsey, 57 Me. 85, that this provision is equivalent to an express provi-

sion for the preservation of an attachment made more than four months before proceedings in bankruptcy, and that thereby such attachments are saved and remain valid.

If the legislature of 1857 were inquired of as to its intention and purpose in case of a delinquent stockholder who had withdrawn his capital, would it not reply that only two days prior to our enacting the Revised Statutes, we by a legislative act, chapter 58, declared our intentions in language beyond question, and we did not intend any change by the words we have employed in the revision. Our meaning was to hold him responsible for such conduct to the creditors of the company, and although, in revising the law, we may not have used the clearest language to convey the idea, we have in fact declared that if the stockholder pays in his stock and permits it to remain unimpaired to satisfy corporate debts, he shall by so doing be exonerated from liability for such debts, and by thus exonerating him in such case, have we not only impliedly, but most manifestly indicated that we intended he should be accountable, if he should so conduct as to diminish the fund which creditors should always be at liberty to resort to wholly unimpaired.

That such was the design of the legislature, we gather from the further provision of the same section, by which the security provided for a creditor for debts of the corporation, contracted after June 1st, is that the stock of the individual stockholder in the corporation may be seized and sold on the execution. What possible profit or advantage would such a remedy prove to a creditor, if each stockholder could with entire impunity withdraw from the corporation the capital he had paid in? If a corporation on the verge of insolvency could with safety to its stockholders divide among them its capital, leaving nothing but the shares of a mere nominal value, such a course would in all cases be resorted to, and thereby the remedy of the creditor would be rendered of no avail whatever. The 33d section of chapter 46 declares that "corporations, &c., * * * are not allowed to divide any of their corporate property so as to reduce their stock below its par value, until all debts are paid, and then for the purpose of closing its concerns; and in case of such unlawful division, a judgment creditor may file a bill in equity against such stockholder, and the court may decree that any such property may be paid to such creditor in satisfaction of his judgment."

This remedy we hold to be cumulative, additional to that of an action of the case given the 26th section, and not in substitution thereof; that the liability of a stockholder for such a diminution of the corporate funds is clearly and distinctly recognized by this section from the same chapter of the Revised Statutes, and which was a mere revision and condensation of chapter 54, Act 1848. The rule of the federal courts is to adopt the con-

struction of a state statute given to it by the supreme court of the state, and it would have afforded us great satisfaction if we could have found that the question here presented had been decided by the supreme court of Maine. Not being advised of such a decision, we have been compelled to form our own conclusions as to the construction of this statute, unaided by the investigations of the courts of the state, and we are of opinion that a stockholder of a corporation, who has withdrawn a portion of the capital, is by so doing, by force of chapter 46 of the Revised Statutes rendered liable to a suit of the creditor of the corporation on a debt contracted since June 1, 1857. Has the defendant violated the provisions of the statute by an illegal withdrawal of any portion of the capital stock of the company?

The Piscataqua Mutual Fire & Marine Insurance Company was incorporated by the legislature of Maine, as a mutual office by chapter 535, approved March 17, 1855. By section 12, a guarantee capital was authorized not exceeding $100,000, and the directors were empowered "to allow therefor a sum not exceeding six per cent. per annum, and may use, negotiate or assess the same, only for the purpose of paying the just debts of the company." By chapter 426, Laws 1860, authority was given to increase the guarantee capital of the company to $500,000, and by section 2 "the holders of the guarantee capital shall receive such share of the net profits of the company as may be provided by the charter and by-laws of said company, and declared by vote of the directors." By an amendment of the charter, chapter 168, Acts 1862, the company was made a stock company and by the first section of that chapter it was provided "that the guarantee capital shall not be less than $100,000, divided into shares of $100 each," and that the capital "shall be vested in the name of said company, and be held for the payment of all losses and liabilities incurred by said company during the continuance of its charter, or while any liabilities remain outstanding against it."

The 17th section of chapter 49 of the Revised Statutes provides, "that no dividend shall be made by any insurance company after any diminution of the capital stock by losses, depreciation or otherwise. until such diminution is supplied by actual funds, or the value restored;" and we do not find, in any of the provisions of the charter of the Piscataqua Fire and Marine Insurance Co. or of its amendments, any authority to contravene this general law, and distribute as dividends a portion of the capital.

The first section of chapter 168, Act 1862, would the rather require that the whole guarantee capital should be held for the payment of losses, &c., so long as any liabilities were outstanding against the company. By chapter 384, Laws 1867, the surrender of the charter of this company was accepted;

but it was expressly enacted that any special remedies against its officers or stockholders shall not be affected thereby; nor shall this act relieve them, or any of them, from any personal liabilities under any of the statutes of this state."

It is shown that June 1, 1863, the defendant became the owner and received a certificate of eighty-two shares of the stock of this company, paying the company therefor by a transfer to it of eighty-two shares of the Dover and Winnepisseogee Railroad Company stock. He continued to stand upon the books of this company as the owner of these eighty-two shares until May, 1866, when he surrendered to the company the certificate of this stock and received back the eighty-two shares of railroad stock. The defendant received his dividends from the insurance company on the eighty-two shares of its stock standing in his name for the years 1864 and 1865. The directors, by a vote of May 5, 1866, voted, "that the president and secretary be directed to carry into effect the contract with Wm. Hill, according to the obligation of said company under date of June 1, 1863, and that they be authorized and directed to transfer to Wm. Hill eighty-two shares of the Dover & Win. R. R. Co."

The contract referred to by this vote is not produced, and there is nothing found on the record of the directors, excepting the above vote, relating to such a contract; or in any manner referring to or sanctioning the same, which, it is stated, was an agreement by the insurance company to return to Hill, on demand, the railroad stock received by the company from him in exchange for a like amount of its own stock. It is manifest that in May, 1866, when Hill received from this company the reconveyance of the eighty-two shares of railroad stock, the insurance company was deeply insolvent; and we are well satisfied that the defendant was aware of the condition of the company, as he had for for a long time been one of its directors and treasurer.

Their policy of insurance having been procured from the company, by the plaintiffs, prior to these transactions between the defendant and the insurance company, the right of the plaintiffs to resort to the capital of the company, for payment of their demand against the company, as it existed at the date of their contract cannot be impaired by these proceedings. It was a part of the contract that the capital should be applied to the liquidation of the debts of the corporation, and no part of it could be thus withdrawn, so as to impair the rights and securities of the plaintiffs. Such were the general provisions of law on this subject, and such also were the provisions of the charter of this company as amended in 1862, c. 168.

At the date of the plaintiff's policy, the defendant, by the records of the company, was the absolute unqualified owner of eighty-two shares of its stock, and the eighty-two shares of the railroad stock appeared on its books as a portion of the capital of said insurance company. There was nothing whatever, so far as is made to appear, to indicate any other rights or interests than those of full, complete, actual ownership by the several parties of the stocks in the several corporations according to the terms of their certificates. The records of the directors of the insurance company do not contain any note or indication that the defendant had a right to surrender his stock in the insurance company, and on demand to withdraw from its capital the eighty-two shares of railroad stock. From these circumstances, taken in connection with the acts of ownership of the parties over the several stocks, the insurance company receiving the dividends on the railroad stock and paying to the defendant dividends on the stock thus held by him in the insurance company, and the defendant receiving them until the company had become deeply insolvent and its stock of no value, we are of opinion he should not have withdrawn the eighty-two shares of railroad stock and cancelled his certificate of a like number of shares in the insurance company, although the company might perhaps have been bound to carry out this arrangement if the rights of other parties were not affected thereby. As against the plaintiffs, at the time creditors of said company, we hold the transaction as entirely unauthorized, and in its legal operation and effect a prohibited withdrawal of the value of $8,200, of the capital stock of said Piscataqua Fire and Marine Ins. Co.

On the first of August, 1862, the defendant subscribed and paid for 225 shares of the stock of this company for which he received certificate No. 222.

Upon this stock he was paid dividends at the rate of eight per cent. per annum to Nov., 1865. Dec. 24, 1862, it appears from the directors' records it was voted "that the treasurer, Wm. Hill, be and he is thereby authorized to purchase the following certificates of stock, viz: No. 222 for 225 shares, No. * * * amounting in all to 434 shares of the value of $43,400, and the said Hill is authorized to issue company notes for the same, payable on demand and bearing semi-annual interest."

This vote remained dormant, no action of any kind was taken under it for years, so far as it appears, but on the contrary, it was disregarded by all parties, and Hill drew his dividends on this stock at the rate of eight per cent. until Nov., 1865. Thirteen of the shares were disposed of by Hill in 1865, and the certificate for the balance was cancelled in 1866, and Hill received therefor a note of the insurance company for $21,200, being the par value of said shares. This note bears date Feb. 1, 1866, but from all the evidence we find that the project was not carried into effect till sometime afterward, and the note then dated back to Feb. 1st, in order to con-

ceal and cover up the transaction if possible. This note for $21,200, is numbered 156 and dated Feb. 1st. Note No. 155 was dated Feb. 8th. That numbered 157 was dated April 5th. The defendant admits, "that from an examination of the cancellation of the stock certificate it looks as if it was written April 27, 1866, and then Feb. 1, 1866 was written over it."

This operation appears on the company's journal, the entry immediately preceding it bearing date April 25th, and the next subsequent April 26th. We are satisfied that this scheme was not completed until April 26th. The company note was then executed, the parties, the better to conceal their fraudulent designs, dating it Feb. 1st. Hill has since received from the property of the corporation the full amount of this note with interest. This manoeuvre finds no support in the vote of Dec. 26, 1862. All parties were satisfied that they were engaged in an illegal enterprise as is manifest from the false dates inserted by them in the instruments. When it was attempted, the company was insolvent, and it was simply a plan to allow the defendant to cancel his certificate of 212 shares of the worthless stock of this corporation and receive therefor the note of the company for their par value. On the same day a very large amount of notes and other property of the corporation was assigned to this defendant, a portion of which was applied by him to the payment of this note. This whole proceeding was a gross fraud, and as against the plaintiffs, the defendant cannot be permitted to reap any profit therefrom, but must be considered as having thereby withdrawn from the capital of this insolvent company the further sum of $21,200. The company being greatly embarrassed, on April 27th, and May 4, 1866, assigned to the defendant notes and other property of the company to the amount of about $160,000, he being also a bona fide creditor of the company for a very large sum. He collected from the property thus assigned to him $68,502.87, leaving uncollected a large amount. He states that after crediting to the company the sums thus collected, there remained due to him in January, 1869, about $20,000; but to produce this result, he charges the company with the note of $21,200, and interest, and also a note of $3,269, and interest, received by him for dividends which were made in contravention of the general provisions of the statutes, and which were not authorized by the charter of the company nor its amendments, if thereby the capital stock was diminished, which is beyond question; the books of the company also show, that he received for dividends about $4,000 more, he being the owner in all of 500 shares in the stock of said company. The defendant was summoned as trustee of the insurance company on the 8th of June, 1866, on a suit in favor of Albert Bowker, in which suit the defendant was defaulted as trustee, and a judgment was rendered April

8, 1868, against the corporation for $5,016.44 damages and $82.77 costs. An action of sci. fa. is now pending against Hill as trustee in said cause before the law court for York county, and it is claimed by his counsel that he should not be held accountable in this present suit on account of this trustee process, which was instituted long before the present plaintiffs commenced their action against the company. By the 27th section of chapter 46, the stockholder is permitted to "prove in reduction of his liability the amount of corporation debts which he has previously paid, and which have not been repaid to him by the corporation; also, any debt due him from the corporation for which, he at the time might maintain an action at law against it; and may show any other legal cause why judgment should not be rendered against him."

From the exhibit made by the defendant, we do not find he has paid any debts of the corporation which have not been repaid to him, or that he has any other claim on the company; and the pendency of the action of sci. fa. against him does not establish a legal cause why judgment should not be rendered in the present suit. We entertain great doubt as to his liability to be charged as trustee in said cause, and we certainly can perceive no pretence to hold him chargeable on account of the eighty-two shares of railroad stock, which he withdrew from the company in May, 1866. We are also well satisfied, that if he should be held chargeable as trustee, and compelled to pay the full amount of Bowker's judgment against the corporation, that he held in his hands and possession the property and estate of the corporation more than sufficient for his indemnity, after deducting from his claims against the corporation the demands which are manifestly illegal, and for which the corporation was not legally accountable to him. It is claimed that this withdrawal of the eighty-two shares of the railroad stock and of the $21,200, in payment for the 212 shares of the company's stock, if illegal, was a mere nullity and void, and that the case must stand therefore, as if the attempt was unsuccessful and without effect; that the defendant, in law, still continues the owner of these shares in the capital stock of the insurance company. If this is the legal result, then no stockholder could be held accountable for a withdrawal of a portion of the capital stock of the corporation; as in all such cases, the withdrawal of the capital is prohibited, and is in express violation of law, when thereby the capital is reduced below its par value. This defendant, having in our judgment violated the law, such violation, by the force of the statute renders him amenable to the plaintiffs' suit, and when the plaintiffs resort to the remedy provided for them in the act, it is not for the defendant to reply, true, my conduct was in violation of the law, but being so, it was without effect. The law having forbidden my doing as I did, I have not accomplished my purpose.

So far as these creditors are concerned he has accomplished it. The capital of the company is de facto reduced just the amount he has withdrawn, and he must abide the consequences. It is also suggested, that the trustees under the act for closing the affairs of this company have commenced a process in equity against this defendant to recover back from him the property of the corporation thus illegally obtained by him, and that this bill is now pending before the supreme judicial court of York county. It is a sufficient answer to this suggestion that the bill in equity was not filed until Dec., 1868, and the plaintiffs' rights as creditors of the corporation had become vested long previously, and were expressly saved to them by the act accepting the surrender of the charter and authorizing the appointment of trustees to close its concerns.

The defendant being held accountable for debts of the corporation contracted after June, 1857, by reason of his withdrawal of a portion of the capital stock of the company, the limitation of liability for one year does not apply to the present suit. The case shows that the present action was seasonably commenced, and that all the requirements of the statutes as to demand, notice, &c., were complied with. The plaintiffs therefore are entitled to recover from the defendant the amount of their execution against the Piscataqua Fire and Marine Insurance Co., with interests and costs. Defendant defaulted.